I think the judgment of conviction should be reversed and a new trial ordered.

CARDOZO, MCLAUGHLIN and CRANE, JJ., concur with POUND, J.; HISCOCK, Ch. J., and HOGAN, J., concur with ANDREWS, J.

Judgment of conviction affirmed.

---

WILLIAM P. FURNISS et al., Respondents, *v.* WARREN CRUIKSHANK, as Substituted Trustee under the Will of WILLIAM P. FURNISS, Deceased, et al., Respondents, and LUCIUS H. BEERS et al., as Executors of MARGARET E. ZIMMERMAN, Deceased. Appellants.

Will — devise of unimproved real property in trust with power of sale — equitable conversion — when there is unreasonable delay in sale of property cestui que trust should be made good for lost income — basis for equitable division between principal and income — when taxes should be paid from principal.

1. Testator, by his will, directed his executors to divide his residuary estate, real and personal, into seven equal shares and gave one share to his wife. The other six shares he gave to his executors in trust to

receive the income and pay the amount derived from each of the six shares to one of his children. On the death of any of his sons he gave the principal to such of his surviving brothers and sisters as he should by will appoint or on failure of appointment to his surviving brothers and sisters. On the death of any of his daughters the principal was given to such of her issue or brothers or sisters as she might appoint, or on default in appointment, to her mother if surviving, or if not, to her sisters. He then authorized his trustees of each trust to sell, mortgage or lease any lands comprised therein, to agree to a partition of lands held in common and to partition his real and personal estate into the necessary shares. The daughters were unmarried. It appeared that there was available for the trust funds both productive and unproductive real estate and that after deducting from the income the carrying charges of the unimproved property but a small amount was left to be divided between the life tenants. *Held*, that the intention of the testator as derived from the will was to effect an equitable conversion of his real estate — not to leave it to his trustees to determine in their discretion whether or not a sale should ever be had; and that such an intention is confirmed, not negatived, by the facts recited.

2. A further clause in the will reading, " I hereby declare that all the powers herein given are intended to be discretionary and to be exercised or not as the said executors and trustees shall think proper," does not change the result. Many of the powers called for the exercise of discretion. As to the power of sale of the real property, the discretion conferred upon the trustees referred to discretion as to the time of such sale.

3. When the trust fund for one of the daughters was set up in 1874 it consisted of personal property, productive real estate and unproductive real estate. Between 1885 and 1902 these lands were sold at a large advance. *Held*, that the *cestui que trust* should not be deprived of income through a delay on the part of the trustees to effect a sale and, she being dead, her estate is entitled to be made good for the income she would have received had the conversion taken place within a reasonable time; that ordinarily that time is assumed to be one year after the death of the testator, but where, as here, the trustees were given power of sale only after the trusts were constituted, one year from that time fixes the date since which the *cestui que trust* became entitled to this income. ·

4. The basis for an equitable division between principal and income may be reached by taking a sum which invested at the time of the setting up of the trust at such a rate as the trustees would probably have received would amount on the date of the sale to the net amount

received. That sum is principal. The balance is income and the life tenant or her estate is entitled thereto.

5. Taxes on the unimproved lots, after the equitable conversion, should be paid from principal.

*Furniss* v. *Cruikshank,* 191 App. Div. 450, modified.

(Argued February 4, 1921; decided March 8, 1921.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered June 22, 1920, which modified and affirmed as modified a judgment entered upon the report of a referee stating and settling the accounts of the executrices of Sophia R. C. Furniss, who was surviving trustee under the will of William P. Furniss of a trust created for the benefit of Margaret E. Zimmerman.

The facts, so far as material, are stated in the opinion.

*Franklin B. Lord* for appellants. The proceeds of the delayed sales of the Bloomingdale lots included income payable to the life tenant as well as principal to be held for the remaindermen. (*Lawrence* v. *Littlefield,* 215 N. Y. 561; *Spencer* v. *Spencer,* 219 N. Y. 459; *Lamier* v. *Taylor,* 186 App. Div. 271; Schouler on Wills [5th ed.], § 466.) The power of sale in the will of William P. Furniss created an equitable conversion as shown by the will itself, the circumstances surrounding its making and the situation of his property. His daughters were the first objects of his bounty. (*Spencer* v. *Spencer,* 219 N. Y. 459.) The taxes on the unproductive Bloomingdale lots were properly chargeable to capital. (*Matter of Pitney,* 113 App. Div. 845; *Matter of Martens,* 16 Misc. Rep. 245; *Matter of Menzie,* 54 Misc. Rep. 188; *Matter of Coombs,* 62 Misc. Rep. 597; *Matter of Marshall,* 43 Misc. Rep. 238; *Patterson* v. *Johnson,* 113 Ill. 559; *Hite* v. *Hite,* 93 Ky. 259; *Clark* v. *Middlesworth,* 82 Ind. 240; *Matter of Young,* 17 Misc. Rep. 680; *Patterson* v. *Vivian,* 137 App. Div. 596.) The trustees were not bound to set aside a sinking fund to amortize the difference between the cost of bonds pur-

chased at a premium and the amount at which said bonds were ultimately redeemed. (*Matter of Hoyt*, 160 N. Y. 607; *McLouth* v. *Hunt*, 154 N. Y. 179; *Matter of Johnson*, 170 N. Y. 139; *Matter of N. Y. Life Ins. & Trust Co.*, 24 Misc. Rep. 71; *Matter of Guarantee Trust Co.*, 131 App. Div. 658.)

*Brainard Tolles* for plaintiffs, respondents. The Appellate Division did not err in holding that it was the intention of the testator that the Bloomingdale lots, when partitioned among the several trusts established by his will, should form part of the principal of said trusts, and that such principal should be kept intact. (*Yates* v. *Yates*, 28 Beav. 637; *Patterson* v. *Vivian*, 63 Misc. Rep. 389; 137 App. Div. 596; *Jordan* v. *Jordan*, 192 Mass. 337; *Martin* v. *Kimball*, 86 N. J. Eq. 10; 86 N. J. Eq. 432; *Matter of Dept. of Public Parks*, 48 How. Pr. 285; *Chamberlain* v. *Taylor*, 105 N. Y. 185; *Gallagher* v. *Crooks*, 132 N. Y. 338; *Herzog* v. *Title Guarantee, etc., Co.*, 177 N. Y. 86; *Pomroy* v. *Hincks*, 180 N. Y. 73; *Matter of Trumble*, 199 N. Y. 454.) The Appellate Division did not err in holding that the ordinary annual taxes upon the Bloomingdale lots were to be taken into account in ascertaining the " net income of both realty and personalty " which was given by the will to Mrs. Zimmerman. (*Matter of Young*, 17 Misc. Rep. 680; 15 App. Div. 285; 160 N. Y. 705; *Patterson* v. *Vivian*, 137 App. Div. 596; *Hepburn* v. *Hepburn*, 2 Bradf. 74; *Spencer* v. *Spencer*, 219 N. Y. 459; *Matter of Stevens*, 187 N. Y. 471.) The Appellate Division did not err in holding that from the gross income of bonds purchased by the trustees above par, there should be annually restored to principal a sufficient amount to amortize the premium. (*N. Y. L. Ins. Co.* v. *Baker*, 38 App. Div. 417; 165 N. Y. 484; *Matter of Albertson*, 113 N. Y. 434.)

*Julian C. Harrison* for Randolph Perkins, as trustee, respondent. The only permissible interpretation of the

will, so far as the question as to what shall constitute income and what capital in the case of the trust funds is concerned, is that embodied in the judgment of the court below. (*Fries* v. *Osborn,* 19C N. Y. 35; *Mann* v. *Mann,* 14 Johns. Ch. 1.)

ANDREWS, J.   This is the not unusual dispute between those entitled to the principal and those entitled to the income of a trust estate.   One William P. Furniss died in 1871.   By his will he created a trust fund for the benefit of his daughter, Margaret E. Zimmerman, now deceased without issue.   After her death, there was no disposition of the principal.   It goes, therefore, to the heirs or next of kin of Mr. Furniss.   Any income to which Mrs. Zimmerman was entitled goes to strangers, legatees under her will.   Representing them, her executors are appellants here.   On their behalf three claims are presented.   1. At the time of his death Mr. Furniss owned a tract of land in Bloomingdale, unoccupied and unproductive.   It was included in the trust.   For many years the trustees held it.   Finally when it was sold it had greatly appreciated in value.   Some at least of the proceeds of this sale should be regarded as income.   The Special Term and the Appellate Division held otherwise. 2. Taxes on this property should be charged to capital. Again the Appellate Division negatived this claim. 3. Certain bonds were purchased by the trustees at a premium as a trust investment.   Later they were redeemed at par.   The trustees were not bound, as the Appellate Division held, to amortize the difference so as to preserve the principal intact.

1. When the trust fund for Mrs. Zimmerman was set up on December 18, 1874, it consisted of personal property, productive real estate and unproductive real estate, the last valued at $137,250.   Between 1885 and 1902 these lands were sold for a total of $439,337.85.   The net proceeds were $356,760.89.   All have been regarded

as capital. The appellants claim $164,474.36 as income, not because of the increase in value but because of the supposed intent of the testator that the *cestui que trust* — his daughter — should not be deprived of income through a delay on the part of the trustees to effect a sale.

The latest case in this state on the subject is *Spencer* v. *Spencer* (219 N. Y. 459). The decision is that where a testator creates a trust largely of unproductive real estate with an imperative power of sale, so that an equitable conversion is effected, although the time of sale may be left to the discretion of the trustees, then it is not to be assumed that he intended that the first beneficiary should be deprived of all income to the time of sale for the profit of the remainderman, if the sale is delayed because of circumstances. In so holding, we but followed our decision in *Lawrence* v. *Littlefield* (215 N. Y. 561, 568). The same rule obtains in Massachusetts. (*Edwards* v. *Edwards*, 183 Mass. 581.) "The argument" is, as Judge HISCOCK says, "that ordinarily the life tenant is an object of more immediate and greater solicitude to the testator than remaindermen who may not even be in existence during his life, and that it is not to be assumed that a testator intends that a provision of income for a life beneficiary shall be rendered nugatory by delay, whether willful or otherwise, in the creation of a trust fund which is to produce the income, and that, therefore, there ought to be such an apportionment of proceeds on a conversion when finally realized as will give the life tenant such income as the testator must have intended." If, however, there is no imperative power of sale or equitable conversion, if the testator directs the trustees to sell only if and when they think it wise, the argument falls. In such a case there is a clear declaration that what the testator has in mind is to benefit the principal of his estate. It is that he considers, not the needs of the life tenant. (*Yates* v. *Yates*, 28 Beav. 637.)

We must, therefore, determine whether the testator

here designed an imperative power of sale with discretion only as to the time of its exercise or a power that in the trustees' discretion might never be exercised at all. If there is any ambiguity in the will, we may regard the situation of the testator's property at the time of his death, the condition of the beneficiaries and the circumstances surrounding the execution of the will. (*Spencer v. Spencer,* 219 N. Y. 459.)

Mr. Furniss was survived by a widow who has since died, and by three sons and three daughters, all of whom are also now dead. After some devises and bequests to his wife and some other small bequests, he directed his executors to divide his residuary estate, real and personal, into equal shares, equal in number to his surviving wife and children, and he gave one of such shares to his wife. Another of these shares he gave to his executors in trust to receive the income of so much as shall be real estate and the income of the personalty and pay it over to his son William. On the death of William, he gave the principal to such of William's surviving brothers and sisters as he should by will appoint or on failure of appointment to his surviving brothers and sisters. If, however, any decree for the payment of money was obtained against the son, then, so long as it remained in force, the executors were to pay to him so much as might be necessary for his support and the balance to his sisters then living in equal shares. Two other shares were given to the executors under identical trusts for the two remaining sons. Three other shares were then given to them under similar trusts for each of his daughters except that the provision as to the decree for the payment of money was omitted and except that on the death of a daughter the principal was given to such of her issue or brothers or sisters as she might appoint, or on default in appointment, to her mother if surviving or if not to her sisters. He named his wife, two of his daughters and a friend his executors

and trustees and he authorized his trustees of each trust to sell any real estate comprised therein; to mortgage any land " if they shall deem it advisable; " to lease lands for a term not exceeding twenty-one years; to agree to a partition of lands held in common with others and to partition his real and personal estate into the necessary shares; to collect the rents until such partition and apply them to the payment of debts, and to·the payment of taxes, insurance and repairs on his real estate; and to compromise " in their discretion " any claims against his estate. Those of the trustees as shall undertake the execution of the several trusts are authorized " to do and perform every act discretionary or otherwise " that all could perform under the will. Finally " I hereby declare that all the powers herein given are intended to be discretionary, and to be exercised or not as said executors and trustees shall think proper, hereby authorizing a majority of trustees of any share to exercise such discretion if there shall occur a difference of opinion between them."

As to the condition of these sons and daughters in 1871, not only are there no findings but no evidence on which findings could be based except that it may be inferred that one son, at least, had living children. Nor are there findings as to the situation of the property of Mr. Furniss unless the reference in the 9th finding of fact to a certain account is sufficient to make it a part thereof. We assume that it is, especially as by consent it is included in the record. If so, the inferences drawn by the appellants are substantially correct. He had at the time of his death personal property valued at $41,899.33 which was used to pay debts and legacies. Available for the trust funds was productive real estate of the value $490,000 and the unimproved Bloomingdale lots worth more than $1,400,000. These deductions do not seem to be questioned by the respondents. If the trustees succeeded in obtaining six per cent on the pro-

ductive property a gross annual income of $29,400 would result subject to be lessened by commissions and expenses. What the carrying charges on the Bloomingdale lots amounted to in 1871 does not appear. In 1875, however, after the taking by the city of land valued at $524,258 and the reduction in value of the remainder to $962,500, they were $12,150.25. As the respondents also concede, after deducting some small rentals, in 1871 these charges must have amounted to $17,000 annually. The testator knew, however, that these charges would be decreased, and the income of his estate increased when the award in certain pending condemnation proceedings brought by the city was made and paid. The daughters were unmarried.

These facts and the will itself were before the Appellate Division. Nothing more. Upon them and the will must be based its findings that " the will of the testator, considered in the light of the circumstances existing at the time it was made, including the conditions of his property and the probable needs of his family, evinces a clear intent that the principal of the trust funds provided by his will should remain intact; " and that " the income from the testator's real property even prior to the payment of the award * * * was sufficient to meet the probable requirements of his widow and children for their support and maintenance, together with taxes and carrying expenses of all real property belonging to the estate."

We reach the conclusion that the intention of the testator as derived from the will was to effect an equitable conversion of his real estate — not to leave it to his trustees to determine in their discretion whether or not a sale should ever be had; and that such an intention is confirmed, not negatived by the facts recited. If so the entire proceeds of the sale of the Bloomingdale lots should not be credited to capital.

From the will itself it appears that the persons whom

the testator wished to benefit were his widow and children. For existing or possible grandchildren he had little care. In no event were children of his sons to benefit, and children of his daughters only in the event an appointment was made in their favor. Stronger than usual is the argument that the life tenant is the object of the testator's particular solicitude. The estate, real and personal, is to be divided into seven equal shares to be partitioned by the trustees. The personal estate is to be invested and the rents and income of the real estate received, and the total net income paid to the beneficiaries. Upon the death of any of them, however, " the principal sum " is disposed of by appointment. This is a slight indication that the real estate to be held shall produce an income and that it was contemplated that all should be converted into personalty at least before the death of the beneficiary. If judgments were obtained against a son he was to be given only enough for his support and the balance of the income to his daughters. If the total income of the testator's productive property was $29,400 and the carrying charges on the Bloomingdale lots $17,000 a balance remains of $12,400. Each son would, therefore, receive $1,800, yet after providing for his support the testator contemplated a surplus. The will next authorized the trustees to sell any real estate contained in the trust, to mortgage it " if they shall deem it advisable," to lease it, to partition real estate held in common with others, to partition it among the trusts, " in their discretion " to compromise claims, and if any trustee fails to qualify the remainder may do anything " discretionary and otherwise " which all might do " under the expressions of this will." If this were all there could be little doubt that an equitable conversion was effected and that it would be the duty of the trustees to sell unproductive real estate. (*Lawrence* v. *Littlefield*, 215 N. Y. 561; *Wilkinson* v. *Duncan*, 23 Beav. 469.) But does the next clause, in view of earlier expressions in the will; in view

of the apparent interest of the testator in his children and his exclusive attention to their welfare; in view of the fact that more than half the income of the estate was needed to carry unproductive property, change the result? " I hereby declare that all the powers herein given are intended to be discretionary and to be exercised or not as the said executors and trustees shall think proper." That we do not believe. Many of such powers called for the exercise of discretion. Whether or not land should be mortgaged or leased; whether to agree to a partition; whether to compromise claims, all these things could be done not only without harm to but for the benefit of the *cestui que trust.* So as to the time when a sale of such property as the Bloomingdale lots, unimproved but rapidly increasing in value, should be made. But to say that the testator intended to give his trustees power to decide they should not be sold at all is to say he intended to confer upon them the right to destroy the benefits he apparently intended to confer upon his children. For as their value increased so would the carrying charges. It is easily conceivable that as time went on instead of being $17,000 these charges might absorb the entire income. And all for the benefit, so far as the last trust is concerned, of unknown persons who might when it ended forty or fifty years hence, be next of kin to the testator. We, therefore, think the discretion conferred upon the trustees referred to discretion as to the time of sale.

Authorities are of little help. The construction of every will depends upon the varying language used and the varying conditions surrounding the testator. Perhaps the case most nearly in point is *Spencer* v. *Spencer* (219 N. Y. 459), to which we have already referred. Mr. Spencer left a large estate which included an interest in unimproved property in Williamsbridge, worth $400,000. One-fourth of the proceeds of the sale of this farm, whether made by him or after

his death he bequeathed to his son absolutely. The balance became part of his residuary estate. This residuum, whether real or personal, he gave to trustees to receive the rents, dividends, interest and income and pay them over to his wife for her life, then to his son for life with remainder over. To his executors and trustees he gave power and authority " in their discretion and at such prices and upon such terms * * * as they may deem proper " to sell his real estate; to exchange it; to buy more; to rebuild or reconstruct any building; and to mortgage or lease it for any term of years, with one or more renewals. There was even a clause that showed the testator contemplated that the land might not be sold until after the death of the son. The question was whether the carrying charges on the Williamsbridge land should be paid from the income of the residuary estate. In deciding that they should not be so paid, we gave as our reason that the testator could not have wished that this unproductive property should remain permanently a part of the trust fund. In a little over two years the income from the trust estate was about $36,684.46. From this $10,494.85 had been subtracted for taxes on the farm. It could not have been his intention so to restrict the income of his beneficiary. True a single composite trust fund was created, as here, of which the widow was to receive the net income. This, however, was not decisive. It simply was one circumstance bearing upon the question.

The cases cited by the respondents do not seem to be in conflict with the conclusion we have reached. In *Yates* v. *Yates* (28 Beav. 637) the language used was: " I authorize the said trustees * * * at such times as he or she shall think proper, in case they * * * shall think it necessary so to do, but as to which they * * * shall have absolute discretion, to mortgage, sell or dispose of," etc. The court said the trustees were not bound to sell at all. In *Patterson* v. *Vivian* (137 App. Div. 596)

the facts are not similar. In *Martin* v. *Kimball* (86 N. J. Eq. 10) the residue of the estate was given to trustees to convert the same into cash from time to time at their discretion. It was claimed that the proceeds of unimproved real estate later sold should be apportioned between the life tenants and the remainderman. Taking the will as a whole the vice-chancellor construed it to mean that the life tenant should have the rents of the real estate as a whole — it was partly improved — until conversion and when converted the income derived from the sale. If the will showed this intent the conclusion cannot be questioned. In *Jordan* v. *Jordan* (192 Mass. 337) the will gave to trustees to sell, from time to time his real estate for such price and for such terms as they may deem expedient and reinvest the proceeds. Certain parcels of realty which came to the trustees were unproductive. Carrying charges on them were paid from income. But again the court bases its conclusion upon the design of the testator as shown by the whole will.

Although not argued but as a suggestion, something is said about an estoppel affecting the rights of the life tenant or those of her successors in interest. Such a claim cannot be sustained. Mrs. Zimmerman knew that the property remained unsold. She consented to this manner of administering the estate. As against her this certainly created no estoppel in favor of a remainderman.

Mrs. Zimmerman, therefore, or her estate is entitled to be made good for the income she would have received had the conversion taken place within a reasonable time. Ordinarily that time is assumed to be one year after the death of the testator. Here, however, the trustees were given the power of sale only after the trusts were constituted. Before any sale could be had the real and personal property was to be turned over to them in specie. This occurred on December 18, 1874. We should fix the date December 18, 1875, as the date since which Mrs. Zimmerman became entitled to this income.

What, then, is the basis for an equitable division between principal and income? The question is not an easy one to answer. If the trustees were imperatively required to sell this property before December, 1875, to invest the proceeds at once, and to pay the income to the life tenant irrespective of any interests of the remaindermen, there would be little difficulty. What the life tenant lost, if no sale was made, would be measured by what she was entitled to, yet failed to receive — let us say four per cent on $137,250. But while the testator did not intend her to lose all income until the sale was actually made, yet he also intended to preserve permanently a trust fund. He did not require an immediate sale. Speculative considerations were in his mind. The property might increase in value. Probably it would. A sale to-day might result in a sacrifice. In this matter he rested on the judgment of the trustees. That judgment, rightfully exercised, might induce them to hold it for years. When the sale did come the judgment might prove to be a mistaken one. The property might bring less than if sold in 1875. If so, the principal would be diminished. The life tenant would receive a smaller income than he expected. Or it might bring more. Then the principal would be increased. So would the income. By conferring this discretion this was precisely the kind of risk to which the testator subjected both life tenant and remainderman. But, meanwhile, while the sale might be postponed, it was not intended that the delay should inure solely to the benefit of the remainderman, or that an ultimate loss should be his loss alone. To some part of the proceeds the life tenant was entitled. Any simple rule, as that of damages, will not do. If the sale was at a loss, such a rule might easily take all the principal and so destroy the trust. If there was an abnormal increase the rule might work injustice to the life tenant. For this reason certain courts have adopted this theory. Take a sum, which invested in 1875, at

such a rate, as the trustees would probably have received would amount on the day of the sale to the net amount received. That sum is principal. The balance is income. (*Edwards* v. *Edwards*, 183 Mass. 581.) That rule we should adopt also. Whether the supposed investment should be treated as one made at simple or at compound interest we need not decide. In *Edwards* v. *Edwards* it is not stated. In *Lawrence* v. *Littlefield* (215 N. Y. 561) the claim that the computation should be at compound interest is cited without disapproval. Here, however, the appellants ask for but simple interest at four per cent. We may take them at their word.

In *Lawrence* v. *Littlefield* it was said that in such an apportionment between capital and income, the rate of six per cent should not be used but only such a rate as could have been realized by the trustees on a proper investment had the funds been actually in existence and that it was the duty of the trial court to fix this rate. So in *Edwards* v. *Edwards*, where again the six per cent rate was claimed, the case was referred to a master, to determine what income the trustees would probably have received. This course is not necessary in the case before us. Here the findings show that the trustees were able to invest the trust funds at a rate in excess of four per cent. We may take judicial notice of the fact that during these years that rate would be a moderate rate for authorized investments. And it is all that the appellants ask. If so, we may make the following statement.

| Parcel. | Date of sale. | Net proceeds. | Amount required on December 18, 1875. |
|---|---|---|---|
| A............... | September 3, 1885 | $44, 887 00 | $32, 332 35 |
| E............... | December 31, 1897 | 126, 112 33 | 67, 031 11 |
| B............... | October 2, 1899 | 90, 675 18 | 46, 464 35 |
| C............... | October 9, 1899 | 66, 385 35 | 34, 003 66 |
| D & F.......... | October 6, 1902 | 28, 701 03 | 13, 852 05 |

Making a total of............................. $193, 683 52

The net total of the sales was $356,760.89. The difference would be $163,077.37.

To this sum the life tenant is entitled. It is true that because of the increase in value, because of the good judgment of the trustees, she actually received far more in all than she would have received had the property been sold in 1875 for $137,500. The respondents calculate that if this had been done her total income to the date of her death would have been $485,317.15 and that she actually received $546,854.97, a difference of $61,537.82. Figured at four per cent, we make the difference far more. Which figures are correct, however, is immaterial, unless under some theory Mrs. Zimmerman is to be charged with the excess of these receipts over what she would have received had the sale been promptly made. It might be argued that she should be. It may be said her claim is that the sale should have been made in 1875. What she has lost, therefore, is the difference between what she would have received had it then occurred and what she actually received. But this is the theory of damages. Her position is not that the sale should have been then made, but that it was the testator's intention that when the sale was made in the future she should be thereafter entitled to whatever income the trust fund should yield; and that as to the past she should be equitably recompensed for the period of abstinence.

2. As to the taxes on the Bloomingdale lots the trustees charged them to capital. The Special Term approved. The Appellate Division, however, reversed this result and charged $36,890.04 to income. This was error. If the testator intended to effect an equitable conversion, they should be paid from principal. (*Spencer* v. *Spencer*, 219 N. Y. 459.) The Special Term, however, was guilty of a slight mistake. The conversion is to be deemed to occur as of December 18, 1875, not 1874. One thousand nine hundred and eighty-seven dollars and seventy-five cents was paid before that date. That should

be charged to income. But the Appellate Division points out that $3,870.86 of rents were improperly credited to capital and deducts that sum from the total of the taxes. We may do the same. The net result would be to add to the income account as found by the Special Term $1,883.11.

3. As to the question of amortization, the Appellate Division is so clearly right that no discussion is required. (*Matter of Stevens*, 187 N. Y. 471; *N. Y. Life Ins. & Trust Co.* v. *Baker*, 165 N. Y. 484.)

The result would be that we should modify the judgment appealed from by (a) reversing that part of the judgments of the Appellate Division and the Special Term as hold that the income of the trust fund should be credited with no part of the proceeds of the sale of the Bloomingdale lots and by decreeing that the sum of $163,077.37 should be credited to the income of the trust fund and not to the principal and by surcharging the trustee in regard to income with that amount and by crediting her in regard to principal with the same amount; (b) by reversing that portion of the judgment of the Appellate Division which provides that the taxes, water rates, marshal's fees and legal expenses in connection with said lots were properly chargeable against the income of the trust estate and affirming the judgment of the Special Term in that regard and by further decreeing that the sum of $1,883.11 should be credited to the income of the trust estate and not to the principal, and by surcharging the trustee in regard to income with that amount and by crediting her in regard to principal with the same amount; and as so modified the judgment appealed from should be affirmed, with costs in this court and in the Appellate Division to the appellants.

HISCOCK, Ch. J., POUND, McLAUGHLIN and CRANE, JJ., concur; HOGAN and CARDOZO, JJ., dissent.

Judgment accordingly.