Laurence D. Wood, S.
This is a proceeding for the judicial settlement of the account of Jane Sage White Canfield, Cass Canfield and The Merchants National Bank & Trust Company of Syracuse, New York, as executors of the will of Ernest I. White, deceased, which was admitted to probate by this court on November 15, 1957.
Cornell University appears herein as a legatee under clause or article numbered “ Thirteenth ” of the will.
Attorney John H. Ejtnghes was duly appointed by this court as special guardian for 15 infants who are presumptive remainderman of the eight equal trusts established under clause or *991 article numbered “ Fifteenth ” of the will which is the residuary clause thereof.
The will bears the date of October 28, 1955. Two codicils to it bearing the dates September 5, 1956 and August 5, 1957 were also admitted to probate simultaneously with the will. These codicils in no manner affect the questions raised here. They renumber articles numbered Seventh to Nineteenth inclusive of the will to be numbered articles Eighth to Twentieth, inclusive, and add a new article numbered Twenty-first.
Clause or article originally numbered “ Thirteenth” of the will gives to Cornell University 10% of decedent’s net estate as defined by the decedent in a second, immediately following paragraph of the same article. This definition is here quoted: “ The term ‘ net estate ’ as used in this Clause as a base for the computation of the amount of said bequest shall mean my estate after deducting therefrom the property described in the Second Clause, my debts, funeral expenses, expenses of administration and all other expenses chargeable to my estate and before deducting therefrom any estate or other inheritance or succession taxes which may be chargeable to my estate ”.
Clause or article originally numbered “ Fifteenth ” of the will establishes eight equal trusts with income payable to grandchildren of decedent and remainders to their issue among whom are the infants for whom the special guardian objects to the account as filed. It is agreed that this article constitutes residuary legacies and that article numbered ‘£ Thirteenth ’ ’ constitutes a general legacy to Cornell University. The will contains no directions as to the two questions raised by the objections filed, first the distribution of increase in principal during the period of administration and second whether executors’ commissions attributable to income should be charged to income oj to principal as the executors by their account propose to do.
The account as filed with this court covers the period from the date of the death of the decedent to the date April 30, 1964. During this period the estate had a net increase in principal in the agreed amount of $804,267.56 over its original inventory value of $4,676,848.96. During the accounting period substantially all income amounting to $641,333.99 was paid to the income beneficiaries of the eight residuary trusts without anything withheld to apply on executors’ commissions. Substantial principal payments were made on account to Cornell University in partial payment of its general legacy under the will and $17,000 was paid to it in compromise of interest on its bequest. No corresponding principal payments were made under the residuary clause.
*992 The executors by their account propose to complete the payment of Cornell University’s general legacy by paying to it such a sum as will, in addition to the principal amount already paid on account, equal 10% of decedent’s “net estate” as defined by him, in accordance with the original inventory value of the “ net estate ” plus 10% of the increase in principal of the “ net estate ” during the accounting period.
The special guardian objects to such a division of principal increase because of the fact that during the course of administration partial principal payments were made to the general legatee, Cornell University, without corresponding and proportional principal payments being made at such times to the trusts created under the residuary clause of the will. He contends that this amounted to giving one legatee an improper or illegal priority over other legatees. He does not question Cornell’s right to some part of the increase in principal, but does object to the amount of it as computed by the executors. He contends that because of the partial principal payments made to Cornell, Cornell is not entitled to a full 10% of the principal appreciation after the partial payments to it, but is entitled only to a reduced share of the appreciation based on its interest in the assets on hand after said partial payments, amounting to approximately 2.2% of the net appreciation.
In Schedule Gr of the account the executors’ commissions have been computed on figures which include income received during the course of the administration of the estate in addition to its original principal inventory value, plus increases in principal value and less the amount of the specific bequests. The commissions as computed plus the separate commissions of 5% of gross real property rents collected are all charged against the principal of the estate as a part of its expenses of administration. In paying over income to the beneficiaries of the residuary trusts no deductions were withheld from these payments by the executors on account of executors’ commissions, although the wording of the will in each trust provision is ‘1 and to pay the net income to ” such beneficiaries.
The special guardian objects to the executors’ intention to charge all commissions against principal and contends that commissions as computed on income received during the administration should be charged to income and deducted from income paid over to the income beneficiaries. The executors in their supplemental memorandum filed herein on September 5, 1965 concede that as to real property rents collected, this objection is valid and that their commissions on rents should have beep *993 retained from the rents collected pursuant to subdivision 6 of section 285 of the Surrogate’s Court Act. The account shows gross rents collected of $196,689.01 on which the commissions would amount to $9,834.45. This would reduce the amount of executors’ commissions charged against principal from $131,224.57 to $121,390.12.
However it is our opinion that the entire amount of income received by the executors during the administration of this estate should have been separated from principal and principal increase, and the executors’ commissions as computed on said income should have been charged to said income received, and should have been retained by the executors from the payments made to the residuary trust income beneficiaries, pending a decree on accounting. We believe that this would be an application of equitable principles that in the absence of explicit mandate by the testator, the income beneficiaries should receive the net income remaining after deducting all charges that equitably should be borne by income interests. We find that executors’ income commissions were among such charges. (Matter of Grant-Suttie, 205 Misc. 640; Matter of Albertson, 113 N. Y. 434; Matter of Jackson, 258 N. Y. 281; Matter of Chapal, 269 N. Y. 464.)
The practical importance of this change is that it will result in a substantial reduction in the expenses of administration which are to be deducted from decedent’s estate in determining the amount of the “ net estate ”, as defined by the decedent to be used as a base for the computation of the bequest to Cornell University. This will result in Cornell’s 10% being larger than it would be if all executors’ commissions were charged to principal as intended in the account as filed.
Section 27-d of the Personal Property Law, known as the Uniform Principal and Income Act does not apply here because all of these transactions took place prior to June 1, 1965, when said statute in its present form became effective. The executors in their brief have cited in support of their proposal to charge income commissions to principal, the opinion in Matter of Chave (227 App. Div. 554). We do not agree with the executors ’ contention that this case holds that commissions computed on income should be charged to principal.
The account as filed also charges to principal as an administrative expense in Schedule B, United States fiduciary income taxes and New York State fiduciary income taxes for the years 1958, 1959, 1961 and 1963. Also in Schedule B, but under the heading “ Administrative Expenses Paid Out of Income ” is an item *994 entitled “United States Fiduciary Income Tax 1959 — $3,788.65 ”. We do not understand why only this income tax payment was charged to income and not the other above-enumerated ones also. We believe that all income taxes except such as are caused by capital gains should be treated the same way as executors’ income commissions, as charges that equitably should be borne by income interests and deducted in arriving at the net income payable to income beneficiaries. Taxes caused by capital gains should be paid from principal.
It is agreed that the only parties having any interest in the distribution of the increase in principal during the accounting period are Cornell University under article “ Thirteenth ” of the will and the parties interested in the trusts created under the residuary clause, article ‘1 Fifteenth ’ ’ of the will. The will being silent as to directions and there being a dearth of authorities on the exact question involved, we believe that a construction by the court is necessary in order to settle the objection raised here by the special guardian. In doing this we must first determine whether or not we can find a testamentary intent or any testamentary plan or scheme. The courts have repeatedly affirmed the rule that the search for intent is the first and foremost canon of construction of a will and all other rules of interpretation are subordinate to it. When ascertained it must prevail. (Matter of Buechner, 226 N. Y. 440.) We must read the will as a whole or “ from its four corners” in order to do this. (Matter of Rooker, 248 N. Y. 361; Matter of Durand, 250 N. Y. 45; Matter of Larkin, 9 N Y 2d 88.)
The law is well settled that in the construction of a will the intent of the testator, if it can be ascertained, controls. (Matter of Fabbri, 2 N Y 2d 236; Matter of Gautier, 3 N Y 2d 502; Matter of Larkin, supra.)
The language of the will as construed in the light of the facts and circumstances surrounding its execution determines the intention of the testator. (Matter of Thompson, 217 N. Y. 111.)
Here the language of the will seems clear and definite enough as far as it goes. It is what is not said rather than what is said that here concerns us. It would have been a very simple matter for Mr. White to have added one or two more sentences to his definition of “net estate” in clause numbered “ Thirteenth ’ ’ of his will. In such sentences he could have directed how increase or decrease in the principal of his estate during the course of its administration should be treated, if principal payments on account were to be made to Cornell University during the administration period.
*995 The fact that he did not see fit to cover this point by instructions seems of great importance to us. In reading the will “from its four corners ” we find a very complete, precise and carefully drawn instrument. From the words and the ‘ ‘ four corners ” of the will, together with the facts and circumstances surrounding its execution we find a definite testamentary plan or scheme. One of these facts and circumstances surrounding the execution of this will in the year 1955 was that this country was then and still is in a period of economic inflation and steadily decreasing purchasing power of the dollar, as is so ably pointed out and explained by the special guardian in his excellent and thorough brief. Another of these relevant facts and circumstances is that the testator’s property was heavily invested in equity type investments such as corporate common stock, as revealed by an examination of Schedule A of the account. At the time the will was executed in the year 1955 the dominant trend in value or market price fluctuation of such securities Avas and had for a considerable time been upward. The inflationary factors then prevailing would have indicated to a prudent, experienced investor like Mr. White, that this trend would indefinitely continue, as we now can see that it has done. We believe that Mr. White himself fully realized and appreciated these facts and circumstances.
Ernest I. White was himself a thoroughly seasoned and highly capable attorney at law with a great deal of experience in decedent estate matters. He was well known in this community as a highly educated and erudite man and laAA¡yer and as an extensive and very successful investor in both real and personal property. He had a reputation for being very careful and exact in his use of words both in his speaking and in his writing. He Avould, as an experienced laAvyer, have very well known the difference between general and residuary legacies, and also would have known that an estate of the size and complexity of his would take considerable time to administer. He knew what his property was and that a large part of it was invested in a broad portfolio of securities which had fluctuating market values. A man of his learning and experience would have known that it could take as long as seven or eight years or more to administer his estate, during which time there could be many changes in the principal value of his estate.
Mr. White saw fit to put Ms bequest to Cornell in the form of a charge on his “ net estate ” and not on his residuary estate, and as a percentage instead of as a fixed number of dollars. Two things here seem of important significance. He did not want *996 the size of this bequest to be affected by the amount of inheritance, succession and estate taxes payable, such amount being subject to changes from time to time before his death by legislation or both before and after his death by tax decisions in the courts. For this reason he chose to charge this legacy against his “ net estate ” rather than his residuary estate, which is the more usual way that testators do in making a percentage bequest. He might also have had additional reasons for this. As an experienced lawyer he would have known that this made Cornell’s legacy a general one and as such entitled to certain priorities in treatment over residuary legacies, one of which is that general legacies must be satisfied before residuary ones can be paid. (Title Guar. & Trust Co. v. Ebaugh, 184 N. Y. S. 351; Maynard v. Maynard, 108 Misc. 362; Matter of Schlegel, 302 N. Y. 787.)
Mr. White would have known that general legatees are entitled to be paid interest charges on their general legacies if not paid promptly after the expiration of the statutory period but that they do not participate in the income of the estate during its administration as do residuary legacies.
The special guardian herein supports his first objection by the fact that principal payments were made of part of Cornell’s general legacy during the course of the estate administration without corresponding payments being made on the residuary legacies.
We believe that Mr. White could have anticipated that this might be done, and we are unable to find any rule of law requiring an executor to make corresponding or proportional payments to residuary legatees whenever he makes a partial payment to a general legatee or other payments of an estate’s obligations whether for debts, administration expenses or taxes.
Mr. White in his definition of “ net estate” mentions “ expenses of administration ”, A lawyer of his experience in estate administration would surely know that this item cannot be finally determined until the ultimate disposition of any and all contested issues. We have already indicated that as to executors’ commissions on income and as to fiduciary income taxes, the expenses of administration chargeable to principal should be different than as treated by the executors. We do not now know what the final total of administration expenses in this estate will be because of the expenses of this proceeding. We know that there will be an allowance to the special guardian. How much that will be we are in no position at the present time to conjecture. There also may be further attorneys’ fees and disbursements and possibly bills of costs, allowable before final *997 disposition. It will not be until then that anyone will know the exact dollar amount of Cornell’s legacy, upon which figure the principal dollar amounts of the residuary trusts will depend. To withhold payment of a substantial part of a general legacy until such conclusion would unreasonably subject the estate to liability for interest on the legacy and would reasonably subject the executor to criticism if not to surcharge.
In addition to making Cornell’s legacy a charge against his “net estate”, Mr. White fixed the amount in terms of a percentage instead of a fixed dollar amount.
While Mr. White undoubtedly knew on the day he executed his will, just about how many dollars 10% of his “ net estate ” would then amount to, we feel sure that he also knew that this figure could and probably would be substantially different at the time he would come to die and also again different before his estate was finally settled.
From all of the facts and circumstances surrounding its execution and from the wording of the will itself, we believe that Mr. White’s intent was that Cornell University should receive a total of 10% of his 6 ‘ net estate ’ ’ whatever its amount, whether larger or smaller or unchanged, at the time final payment was ready to be made to this general legatee. All increase in principal should be added to original inventory before making the deductions outlined in paragraph “ Thirteenth ” of the will.
Ten percent of the remaining figure will be the total dollar amount of Cornell’s legacy, regardless of whether any of it has already been paid, on account.
In support of his position, the special guardian in his brief very ably argues that his proposed method of division of increase in principal would be impartial. The authorities cited by him apply to situations where the legatees are all in the same class. We recognize the duty of a fiduciary to treat beneficiaries impartially when they are in the same class. However in the present instance, the general legatee, Cornell University, and the trusts created by the residuary clause of the will are in different classes. We recognize this difference as a part of the testator’s testamentary plan or scheme. If the testator had wanted to have them treated absolutely equally in this division of principal increase he would not have put them in different classes, or he would have seen fit to give specific instructions on this point. In the absence of such we believe that the allocation proposed by the executors is the simplest and most obvious division and that if the testator had wanted a different method used he would have said so in this very carefully drawn will.
*998 The executors should recompute their account so that their commissi oris which are attributable to income received during the accounting period are charged to such income and not against principal. Commissions on real property rentals should also be charged against such rents and not against principal. All fiduciary income taxes attributable to income received during the accounting period, except such as result from capital gains, should be charged against income and not principal. The resulting total of administration expenses together with the other deductions specified in article originally numbered “ Thirteenth ” of the will, when deducted from the estate including all increase in principal thereof, as proposed by the executors in their account, will fix the base on which Cornell University’s bequest of 10% thereof should he computed.